# Exhibit A

# VENUE LICENSE AGREEMENT

May 1, 2024 ("Effective Date")

Fifth Degree Tours #2 LLC. ("Licensee") and Live Nation Worldwide, Inc. ("LN") do hereby agree on the following terms, conditions and definitions with regard to Licensee licensing the premises described below to host Licensee's upcoming event:

| | |
|---|---|
| **LICENSEE CONTACT INFORMATION**: | 1101 Woodside Ave.<br>Charlotte, NC. 28205<br>Attn: Jinny Sample<br>jsample@amegpro.com |
| **EVENT**: | Jam Fest ("Event") |
| **VENUE**: | PNC Music Pavilion in Charlotte, NC. ("Venue") |
| **SPACE**: | Amphitheater ("Space") |
| **COSTS/FEES**: | |
| License Fee: | $25,000.00 (the "License Fee") |
| Services included in License Fee | Use of Venue (the "Included Services") |
| Estimated Additional Production & Operations Expenses:<br>Projected costs based on the staging requirements of the Event (cost overruns shall be payable pursuant to the Section 2 of **Exhibit A** attached hereto). | TBD – See Exhibit B (as detailed in **Exhibit B**) (the "Estimated Additional Production and Operating Expenses") |
| Merchandising: | 80% Artist / 15% LN; 90% Artist / 10% LN (for CD/DVD) (collectively, the "Merchandise Split") |
| **LICENSE PERIOD:** | |
| Load In: | Saturday, July 20th, 2024 at 6AM – start of Event Period |
| Event Date and Times: | Saturday, July 20th, 2024 at 6PM – 11PM ("Event Period") |
| Load Out: | end of Event Period – Sunday, July 20th, 2024 by 2AM (collectively, the "License Period") |
| **PAYMENT SCHEDULE**: | |
| Initial Deposit: | $50,000.00; due at contract signing. |
| Second Deposit: | N/A |
| Balance of Amounts Due to LN: | To be offset from ticket sales |
| Liquidated Damages Upon Cancellation (other than due to a Force Majeure Occurrence or material breach by LN): | the License Fee plus any unrecoupable expenses incurred by LN in connection with the Event (the "Liquidated Damages") |
| **OTHER TERMS:** | |
| Venue Capacity: | 18,986 |
| Expected Attendance | 9,000 |
| Curfew: | 11:00PM |
| Age Restriction: | All Ages |
| Facility Fee | $11.00 per paid ticket (to be retained by LN) |
| Promoter Rebate: | $1.50 (to be paid to Licensee) |
| Origination Fee (if applicable): | TBD – if filming only |

**ADDITIONAL REQUIREMENTS**:

| | |
|---|---|
| Estimated production and operations requirements in writing (including personnel, equipment, time, etc. for technical set up, rehearsals, etc.) due by: | 30 business days prior to the Event. |
| Certificate of Insurance due by: | 30 business days prior to the Event. |
| Additional Insureds to be listed on Certificate of Insurance: | Live Nation Worldwide, Inc. and its landlords, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries, and their respective officers, directors, shareholders, employees, agents and representatives shall be listed as Additional Insured with respect to the operations of the Named Insured. Coverage naming the Additional Insureds shall be on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, to the extent of Licensee's liability as described in this Agreement. |
| Executed copy of Agreement due by: | 5/3/24 |

Licensee's Designee (whom Licensee warrants has/have full authority to commit Licensee's funds and to authorize expenditures of monies on Licensee's behalf in connection with the Event):

Name: Wesley Hunter

LN's standard terms and conditions are attached hereto as **Exhibit A** and incorporated herein. Licensee and LN hereby execute this Agreement as of the Effective Date:

| **LICENSEE: FIFTH DEGREE TOURS #2 LLC.** | **LIVE NATION WORLDWIDE, INC.:** |
|---|---|
| By: Wesley Hunter | By: [signature] |
| Name: Wesley Hunter | Name: Jonathan Rosas |
| Title: CEO | Title: National Director 3rd Party Programming |
| Date: 05/03/2024 | Date: 05/05/24 |

**Exhibit A**

**Terms and Conditions**

1. Term.
   A. The term of this Agreement ("Term") shall be from the Effective Date through the License Period, not to include final invoicing and payment.
   B. LN hereby grants to Licensee the privilege and license to use the Space and other LN designated portions of the Venue necessary for production of the Event during the License Period.
   C. Upon the expiration of the License Period or the termination of this Agreement pursuant to a breach of the terms and conditions set forth, prior to the expiration of the Term, Licensee shall immediately quit and surrender the Venue to LN. Licensee shall remove any goods or property brought onto the Venue. Licensee shall reimburse LN for all costs and expenses incurred by LN in the removal of such goods or property if this provision is not complied with.
2. Financial Settlement.
   A. In consideration of the grant of the license to use the Venue and the provision of the Included Services, Licensee shall pay to LN the License Fee in the amount and according to the payment schedule on the first page of this Agreement. Licensee further agrees to pay LN, with prior written approval, for the costs and charges for all additional staffing, production and operational services provided by LN in connection with the Event, including, without limitation, the Estimated Additional Production and Operations Expenses described on the first page of this Agreement and **Exhibit B**. The Estimated Additional Production and Operations Expenses are a good faith estimate by LN but are not intended as a representation or warranty as to the amount of expenditures that will be required to be incurred for the production of the Event in accordance with Licensee's requirements or requests.
   B. Licensee shall pay to LN all amounts as due according to the payment schedule on the first page of this Agreement. If any payment is not received by LN when due, LN may terminate this Agreement. At settlement of the Event, LN will deliver to Licensee a final invoice setting forth the actual charges incurred at the Event, and Licensee agrees to promptly pay any outstanding amounts within three (3) business days following the Event.
   C. If the Event is ticketed, LN will have a first right of offset on all box office receipts for the Event to secure payment of all amounts owed to LN by Licensee hereunder. LN will have the right to retain from the box office receipts all outstanding amounts related to the Event at time of settlement. If box office receipts, net of taxes and applicable fees, are greater than the License Fee and total Event expenses, the excess will be paid to Licensee at settlement of the Event. Payment to Licensee to be made no later than 48 hours after the Event, excluding holidays and weekends.
   D. The Deposits listed on the first page of this Agreement are non-refundable unless otherwise provided in this Agreement. If the Event is ticketed, and Licensee has not taken in an amount sufficient to cover the payment of all amounts owed to LN by Licensee, LN may demand and Licensee shall pay to LN an additional deposit or Licensee may cancel the Event ("Additional Deposit").
   E. Licensee acknowledges that by virtue of entering into this Agreement, LN will forgo other opportunities for the use of the Venue on the scheduled date of the Event and will incur substantial non-recoverable expenses. The parties acknowledge that the lost opportunity costs will be difficult if not impossible to ascertain. As a result, if Licensee cancels the Event at any time following execution of this Agreement, Licensee shall pay LN, as liquidated damages and not as a penalty, an amount equal to the liquidated damages upon cancellation described on the first page of this Agreement ("Liquidated Damages"). All cancellation notices must be made in writing. The Liquidated Damages, less any Deposit(s) or Additional Deposit already received, shall be paid to LN by Licensee within three (3) business days following Licensee's cancellation of the Event.
   F. Federal, state, or local government capacity restrictions, social-distancing protocols, or other health and safety measures ("Health Restrictions") that require a reduction in the Venue Capacity shall not constitute a Force Majeure Occurrence, as defined in Section 16H below; provided however, if Health Restrictions reduce the Venue Capacity to less than 50% of Expected Attendance, the parties shall work together in good faith to reschedule the Event to a mutually-agreeable date in the future ("Rebooked Event"). LN shall retain the Deposit to apply to the Rebooked Event.
3. Parking. The following shall apply if parking is ordinarily available at the Venue:
   A. All parking operations shall be conducted by Venue personnel unless otherwise agreed in writing by LN. All proceeds of such parking operations shall be retained solely by LN. Notwithstanding the foregoing, should Licensee elect not to charge its guests for parking, the cost for parking shall be added as a line item expense to **Exhibit B**.
   B. Specialized parking spaces may be provided but shall not be guaranteed for Licensee's employees and guests, in locations designated by LN. LN shall not be responsible, under any circumstances, for any loss or damage occurring to automobiles brought to the Venue by Licensee's employees, subcontractors or guests.
4. Merchandise and Concessions.
   A. Unless otherwise agreed by LN, LN's designated food and beverage concessionaire (the "LN Concessionaire") shall provide all food and beverage service and retain one hundred percent (100%) of the profits there from. Unless otherwise agreed by LN, LN's designated merchandise vendor shall sell all merchandise and retain the portion of merchandise revenue, net of tax, credit card processing fees and bootleg security, as applicable, according to the Merchandise Split provided on the first page of this Agreement.

B. In the event that LN permits Licensee to utilize a non-LN catering service ("Outside Caterer") to provide food services, Licensee shall ensure that the Outside Caterer abides by the following:
   i. Outside Caterer shall not provide any beverage service.
   ii. Outside Caterer shall indemnify and hold LN, LN's landlord and the LN Concessionaire harmless from any claims, suits, losses, injuries, liability and damages (including reasonable attorneys' fees and court costs) (collectively, "Claims") arising out of or related to the Outside Caterer's acts, omissions, negligence or services.
   iii. Outside Caterer shall comply with the insurance requirements set forth in Section 14.E.

5. Ticketing.
   A. If the Event is to be ticketed, all ticket sales for the Event shall be conducted through the LN box office and the facilities of LN's designated ticketing agent, Ticketmaster. All ticket sales shall be subject to applicable taxes, credit card processing fees, service fees, Facility Fees and/or parking fees as provided by LN. LN reserves the right to retain a reasonable number of complimentary tickets and pre/post party passes for the Event for LN's use. LN may have non-manifested corporate boxes and/or premium seats, for which tickets will not be included in the gross ticket receipts. If applicable, LN will provide all premium seat customers (including, without limitation, box and season seats) at the Venue with tickets for their regular seats for the Event at no cost to LN.
   B. LN may, but shall not be required to, make ticket refunds (or partial refunds) for cause. Cause shall include, without limitation, seats blocked by equipment (when exchange for a comparable location is not possible), failure of any performance of the Event to begin when scheduled by Licensee and failure to hold any performance of the Event. In addition to any other monies owed to LN, Licensee shall pay LN for LN's share of lost gross receipts from such tickets and for all costs associated with such refunds, except when caused by any failure of LN to perform under this Agreement.

6. Advertising and Promotion. Licensee shall be responsible for producing and paying for any and all advertising and promotional materials in connection with the Event. All such materials shall be subject to the prior approval of LN. Licensee acknowledges and agrees that, notwithstanding any marketing or other related assistance which may be provided by LN (although LN is not obligated to provide same), LN has made no representation or warranty and disclaims any purported or actual representation or warranty as to the results and/or success which can be expected from the Event, including, without limitation, ticket sales and/or the profitability of the Event. Licensee acknowledges and agrees that LN shall in no way be responsible for the actual results from and/or the success, financial or otherwise, of the Event.

7. Booth / Commercial Space. In the event that Licensee desires to sell booth/commercial space ("Booth Space") at the Venue to vendors or exhibitors, or otherwise permit vendors or exhibitors at the Venue in connection with the Event, Licensee shall comply with the following provisions:
   A. Licensee will first obtain LN's approval of each Booth.
   B. Licensee will be solely responsible for causing Booths to comply with applicable law and applicable Venue rules and regulations.
   C. Licensee will be solely responsible for ensuring payment of any and all taxes or other fees associated with the Booths or the use of the Booth Space.

8. Recording Rights/ Photography. Unless Licensee executes the LN Recording Addendum, Licensee shall not conduct or permit any photography, film, video, audio or other recording of the Event to take place. Notwithstanding the foregoing, Licensee's guests may photograph and record the Event for their personal use unless otherwise restricted by Event talent.

9. Charitable Donations. In the event that LN permits and Licensee obtains the right to collect charitable donations in connection with the Event, Licensee shall comply with all Applicable Laws (defined below) in connection with the solicitation and collection of such donations. Licensee further agrees that it will be solely responsible for all tax and other liability related to such donations.

10. Use and Condition of Venue.
   A. Acceptance of Venue. Licensee accepts the condition of the Venue ***as is*** and agrees to return the Venue to LN in the same condition as accepted by Licensee. Licensee has examined the Venue and is satisfied with the condition, fitness and order thereof.
   B. No Alterations or Improvements. Licensee shall not paint, drill into or in any way mar or deface any part of the Venue. Licensee shall pay LN for the cost of repairing any damage to the Venue caused by the Event within three (3) business days following the Event.
   C. Maintenance of Venue. Licensee shall keep the Venue in an orderly condition and cause all refuse and debris to be properly discarded.
   D. Operational Protocols. Without limitation of any of Licensee's obligations herein, Licensee shall comply, and ensure that all of Licensee's employees, agents, volunteers, contractors, patrons, guests, invitees, participants and performing artists involved in the Event (together with Licensee, "Licensee Parties") comply with all LN and Venue rules, regulations, and health and safety protocols related to the use and occupancy of the Venue, the operation of the Event, and/or any standards related to COVID-19 or other public health emergencies (collectively, "Operational Protocols"). Operational Protocols may include, without limitation, staggered arrival and departure times, temperature checks, pre-sanitization requirements, physical distancing, masks/face coverings, food & beverage service and handling, and requiring persons developing or exhibiting symptoms to leave the Venue.

E. Abandoned Property. LN will have the full right to collect and have custody of all articles and personal property left on the Venue or at the Venue after the expiration of the Term. Any property so left will be deemed abandoned by Licensee and may be disposed of by LN, as LN sees fit, without any liability for any loss, damages or costs associated with such disposal, which liability will rest solely with Licensee.

F. **PROHIBITED OBJECTS AND ACTIVITIES AT VENUE. UNLESS OTHERWISE AGREED IN WRITING BY LN, THE FOLLOWING SHALL NOT BE PERMITTED INTO THE VENUE OR THE SURROUNDING PROPERTY AT ANY TIME: OUTSIDE ALCOHOLIC BEVERAGES; INTERACTIVE PHYSICAL GAMES; MECHANICAL RIDES; BODY ART AND PIERCING; EXOTIC ANIMALS; PYROTECHNICS; TEMPORARY STAGING; OR FLASHING OR STROBE LIGHTING.**

11. Representations, Warranties and Covenants.

A. LN hereby represents and warrants that it has full power and authority to enter into this Agreement and to engage in the transaction contemplated hereby and that this Agreement is a valid obligation of LN and is binding upon LN.

B. Licensee hereby represents and warrants that it has full power and authority to enter into this Agreement and to engage in the transaction contemplated hereby and that this Agreement is a valid obligation of the Licensee and is binding upon the Licensee.

C. Licensee and the other Licensee Parties shall comply with all applicable statutes, rules, regulations, protocols, guidelines (including health and safety guidelines), and orders, interpretation, or application of any governmental authority, or court (collectively, "Applicable Laws") Applicable Laws, in connection with the Event. Licensee will be responsible for obtaining and paying for all licenses or permits necessary for holding the Event, including, without limitation, tax requirements and any permits required by governmental authorities for pyrotechnics or laser use.

D. Licensee represents and warrants that it owns or otherwise has the right to use the name of the Event and any trademarks and logos related thereto and any creative materials, including performing artist images, used in connection with the Event, and that the use of such name and creative materials shall not infringe the rights of any third party.

E. Licensee represents and warrants that any and all use or performance of copyrighted material in connection with this Event has been duly licensed and authorized by the appropriate performing rights organizations (including, without limitation, BMI, SESAC and ASCAP), copyright owners or their representatives and that any license or royalty fees owed to such persons or entities shall be paid by Licensee. Furthermore, Licensee agrees to indemnify and hold LN harmless from any and all Claims incurred as a result of any violations of such intellectual property rights or the laws relating thereto. Notwithstanding the foregoing, LN reserves the right to collect such payments from Licensee at Event settlement and remit to appropriate parties on Licensee's behalf.

F. In the event Licensee is unable to meet the requirements of Section 11.E. above and if LN so elects, LN may warrant that it has been duly licensed and authorized by the appropriate performing rights organizations (including, without limitation, BMI, SESAC and ASCAP), copyright owners or their representatives for the use or performance of copyrighted material in connection with the Event at the Venue. Any license or royalty fees owed to such persons or entities shall be paid by Licensee.

12. Indemnification.

A. In addition to any other indemnification requirements set forth herein, Licensee agrees to indemnify, defend and hold harmless LN and LN's landlord(s), if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries, and their respective officers, directors, shareholders, employees, agents and representatives (collectively, "LN Parties") from and against any and all Claims, including for bodily injury and property damage, arising or alleged to have arisen out of: (i) any act or omission of any of the Licensee Parties; (ii) any allegation that the name of the Event and any trademarks or logos related thereto, or the use of any creative materials, including performing artist images, in connection with the Event infringe the rights of any third party; (iii) Licensee's breach of any of the provisions of this Agreement; and/or (iv) alleged exposure of any of a Licensee Party to or contraction by a Licensee Party of any communicable disease or illness (including COVID-19) or any bacteria, virus, or other pathogen capable of causing a communicable disease or illness ("Communicable Disease") in connection with the Event, whether occurring before, during or after the Event, however caused or contracted. The parties agree, however, that Licensee shall not be obligated to defend or indemnify a LN Party for any Claims that arise out of such LN Party's gross negligence or willful misconduct.

B. Licensee agrees that to the extent any Licensee Party places any material, equipment and other property ("Licensee Property") in the Venue, they do so at their own risk and Licensee hereby releases, indemnifies, defends, and holds harmless the LN parties from all claims for any damage or injury to any Licensee Property.

C. The indemnification provisions contained throughout this Agreement shall survive the termination of this Agreement.

13. Limitation of Liability and Waiver of Claims.

A. Licensee will be solely responsible for the conduct and activities of all Licensees Parties and, for purposes of this Agreement, such conduct and activities shall be deemed conduct and activities of Licensee.

B. Neither party will, under any circumstances, be liable for any incidental, punitive, exemplary, speculative or any consequential damages arising out of the services provided under this Agreement; provided that the foregoing shall not be construed to cover any third party Claim with respect to which Licensee has committed to indemnify LN.

C. Licensee agrees to use and occupy the Venue and instruct all other Licensee Parties that they will use and occupy the Venue at their own risk. Notwithstanding implementation of the Operational Protocols, Licensee specifically acknowledges that an

inherent risk of exposure to Communicable Disease exists in any public place where people are present. COVID-19 is an extremely contagious disease that can lead to severe illness and death. According to the Centers for Disease Control and Prevention, senior citizens and those with underlying medical conditions are especially vulnerable. LICENSEE ACKNOWLEDGES ON ITS BEHALF, AND ON BEHALF OF THE LICENSEE PARTIES, THAT LICENSEE AND THE LICENSEE PARTIES VOLUNTARILY ASSUME ANY AND ALL RISKS RELATED TO EXPOSURE TO COVID-19 AS WELL AS ANY OTHER COMMUNICABLE DISEASE FROM THE EVENT AND THE VENUE AND HEREBY RELEASE THE LN PARTIES FROM LIABILITY IN CONNECTION THEREWITH.

14. Insurance Requirements.

A. Licensee will maintain and pay all premium costs for the following insurance coverages in amounts not less than specified throughout the duration of the Term:

i. Statutory Workers' Compensation including Employer's Liability Insurance, subject to limits of not less than One Million Dollars ($1,000,000.00), affording coverage under applicable worker's compensation laws. Licensee will cause, if allowed by law, its workers' compensation carrier to waive insurer's right of subrogation with respect to the LN Parties.

ii. Commercial General Liability Insurance for limits of not less than One Million Dollars ($1,000,000.00) per occurrence Bodily Injury and Property Damage combined; One Million Dollars ($1,000,000.00) per occurrence Personal and Advertising Injury; Two Million Dollars ($2,000,000.00) aggregate Products and Completed Operations Liability; One Hundred Thousand Dollars ($100,000.00) Fire Legal Liability, and Two Million Dollars ($2,000,000.00) general aggregate limit per event. The policy shall be written on an occurrence basis.

iii. Automobile Liability Insurance with a limit of not less than One Million Dollars ($1,000,000.00) combined and covering all owned, non-owned and hired vehicles.

iv. Umbrella Liability Insurance at not less than Four Million Dollars ($4,000,000.00) limit providing excess coverage over all limits and coverages noted in policies ii. and iii. above. This policy shall be written on an occurrence basis.

B. Policies ii., iii. and iv. above shall list Live Nation Worldwide, Inc. and its landlords, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries, and their respective officers, directors, shareholders, employees, agents and representatives as "Additional Insureds" with respect to any and all claims arising from Licensee's operations. Licensee is responsible for any and all costs for such coverages or waivers. Policy ii. above may not be written on a 1996 or earlier ISO General Liability coverage form.

C. At least thirty (30) business days prior to the Event date, Licensee shall provide LN Certificate(s) of Insurance compliant with the aforementioned required endorsements. The certificate holder shall be Live Nation Worldwide, Inc. and the Additional Insured language shall be exactly as described above. Such coverage shall be primary and not contributory to any insurance maintained by LN and contain a waiver of subrogation in favor of LN. All required insurance will be placed with carriers licensed to do business in the applicable state, have a rating in the most current edition of A.M. Best's Property Casualty Key Rating Guide that is reasonably acceptable to LN. Licensee will provide thirty (30) days written notice of cancellation or non-renewal to LN. Failure of Licensee to provide the requested certificates, or failure of LN to specifically request such certificates, shall not limit or release Licensee of its obligations or liabilities hereunder.

D. The insurance obligations stated in this section are independent of, and shall not be affected by the scope or validity of, any other indemnity or insurance provisions in other sections of this Agreement.

E. Licensee will ensure that all of its contractors (including, without limitation, sponsors, Booth Vendors and Outside Caterers) who will be entering the Venue to engage in any business activity will maintain the following insurance coverages: (i) Statutory Workers Compensation, including employer's liability, with a limit of not less than One Million Dollars ($1,000,000.00) per occurrence; (ii) Commercial General Liability with a limit of not less than One Million Dollars ($1,000,000.00) per occurrence; and (iii) Business Automobile Liability for all owned, hired or non-owned vehicles to be driven onto the Venue, with a combined single limit of not less than One Million Dollars ($1,000,000.00). Satisfactory evidence of coverage must be provided to LN upon request. LN reserves the right to require higher insurance limits depending on the nature of services being provided by the contractor.

15. Sponsorships and Signage.

A. Licensee understands and agrees that LN has entered into signage and sponsorship relationships related to the Venue for which LN will retain all proceeds. LN reserves all rights to display signage and conduct activations at, on or near the Venue property. No signs or advertising boards or activations, other than those authorized by LN, will be allowed into, on or near the Venue. Licensee will not mark, cover or attempt to modify any signage at, on or near the Venue.

B. Licensee is required to obtain LN's prior written approval of any sponsorship relationships into which Licensee desires to enter for the Event.

16. Miscellaneous.

A. Third Party Beneficiaries. This Agreement does not confer any rights or benefits upon any persons or entities other than LN and Licensee and their permitted, respective successors and assigns. There are no third party beneficiaries.

B. Relationship of the Parties. Nothing contained in this Agreement will be deemed to constitute LN and Licensee as partners or joint venturers. Each party acknowledges and agrees that it neither has nor will give the appearance or impression of having any legal authority to bind or commit the other party in any way. Licensee agrees that it will be solely responsible for the

payment of all wages, federal, state and local income taxes, as well as all workers' compensation insurance requirements for all personnel it supplies pursuant to this Agreement.

C. Entire Agreement and Modification. This Agreement contains the entire agreement between the parties relating to the subject matter hereof and all prior agreements related hereto which are not contained herein are terminated. This Agreement may not be amended, revised or terminated except by a written instrument executed by the party against which enforcement of the amendment, revision or termination is asserted.

D. Assignment. Neither this Agreement nor any part hereof shall be transferred, conveyed or assigned by Licensee without the prior written consent of LN.

E. Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the state in which the Venue is located, without giving effect to its choice of law principles.

F. Use by LN. It is specifically agreed and understood that LN has the right to occupy and use the Venue during the Term and to license any portion thereof, provided that such use or license does not unreasonably interfere with Licensee's use of the Venue.

G. Utilities. No interruption or malfunction of any utility services, whether such services are provided by LN or arranged for by Licensee, shall: (i) constitute an eviction or disturbance of Licensee's use and possession of the Venue or a breach by LN of any obligations hereunder; (ii) render LN liable for damages; or (iii) entitle Licensee to be relieved of any obligations hereunder. In the event of any such interruption of service provided by LN, LN shall be obligated only to use reasonable diligence to restore such service.

H. Force Majeure. The failure of any party hereto to comply with the terms and conditions hereof because of a "Force Majeure Occurrence" shall not be deemed a breach of this Agreement. "Force Majeure Occurrence" shall be defined to include, without limitation, Acts of God, strikes, labor disputes, war, fire, earthquake, serious weather anomalies such as hurricane, tornado, cyclone, typhoon, blizzard, tidal wave, tsunami or flood, acts of public enemies, acts of terrorism, epidemic, action of federal, state or local governmental authorities, or other event or reason beyond the reasonable control of a party that, in each case makes the non-performing party's performance impossible or impractical. In the event of a cancellation of the Event due to a Force Majeure Occurrence, each party shall be relieved of its obligations hereunder with respect to the performance so prevented and neither party shall be obligated to compensate the other for any expenses incurred in connection with such cancellation and LN shall refund any Deposits received from Licensee in connection with the Event.

I. Taxes. Any and all sales tax, amusement tax or other tax imposed by local, state, provincial or federal government as a result of the presentation of the Event in connection with this Agreement hereunder, shall be the responsibility of and paid for by Licensee at the time required by law (excepting any state or federal income tax imposed on LN). If Licensee is tax exempt, Licensee must provide a copy of Licensee's tax exemption certificate issued by the state in which the Venue is located to LN no less than three (3) business days prior to the Event.

J. Prevailing Party. If either party institutes an action or proceeding against the other to enforce the terms of this Agreement, then the prevailing party in such action or proceeding will be entitled to recover from the other party the reasonable attorneys' fees and costs incurred therein. For purposes of this Section, a prevailing party shall include, without limitation, a party who brings an action against the other party by reason of the other party's breach or default of this Agreement and obtains substantially the relief sought, whether by compromise, settlement or judgment.

K. No Waiver of Rights and Invalidity. If either party fails to enforce any of the provisions of this Agreement or any rights or fails to exercise any election provided in this Agreement, it will not be considered to be a waiver of those provisions, rights or elections or in any way affect the validity of this Agreement. If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of this Agreement will remain in full force and effect and will in no way be affected, impaired or invalidated.

L. Notices. All notices given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally with receipt acknowledged or sent by registered or certified mail or equivalent, if available, return receipt requested, or by email (which shall be confirmed by a writing sent by registered or certified mail or equivalent on the same day that such email is sent), or by nationally recognized overnight courier for next day delivery, addressed or sent to the parties at the addresses set forth herein with a copy to Live Nation Worldwide, Inc., 325 N. Maple Drive, Beverly Hills, CA, 90210; Attention: Legal Department.

M. Counterparts. This Agreement may be executed by facsimile and PDF and in any number of counterparts, and each of such counterparts shall be deemed an original.

ACCEPTED AND AGREED as of the date and year first above written.

| **LIVE NATION WORLDWIDE, INC.:** | **LICENSEE: FIFTH DEGREE TOURS #2 LLC.:** |
| --- | --- |
| By: [signature] | By: Wesley Hunter |

BLANK PAGE

**Exhibit B**

**Estimated Additional Production & Operations Expenses**

| Production Expenses | Estimated Expenses | Notes |
|---|---|---|
| Auto Rental | TBD | *Based on Production Advance* |
| Local Catering | TBD | *Based on Production Advance* |
| Communication Equipment | $ 725.00 | *Amortized Expense/existing rental* |
| Equipment Rental | $ 800.00 | *Amortized Expense/existing rental* |
| Dressing Room Furniture | $ 1,000.00 | *Amortized Expense/existing rental* |
| Audio Rental Expense | TBD | *Based on Production Advance. No existing audio* |
| Lighting Rental Expense | TBD | *Based on Production Advance, No existing lighting* |
| Lawn Sound | $ 550.00 | *Amortized Expense/existing rental* |
| Runner Expense | TBD | *Based on Production Advance* |
| Site Set Up/Tear Down | TBD | *Based on Production Advance* |
| Stage Expense, Inc. Gases | $ 1,000.00 | *Based on Production Advance* |
| Stagehand Expense | TBD | *Based on Production Advance, $175 per stage crew union member Recording in addition to LN policy.* |
| Towels & Laundry Expense | $ 200.00 | *Amortized Expense/existing rental* |
| Trailer Rental | $ 450.00 | *Amortized Expense/existing rental* |
| Video Expense | TBD | *Based on Production Advance* |
| SFX, Inc. Pyro Expense | TBD | *Based on Production Advance* |
| Production Assistant / Production Manager | TBD | *Based on Production Advance* |
| | **$ 4,725.00** | ***Total*** |

| Operations Expenses | Estimated Expenses | Notes |
|---|---|---|
| Barricade Expense | $ 800.00 | *Amortized Expense/existing rental* |
| Box Office Staff | $ 1,850.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Clean Up Expense | $ 11,000.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Event Security Expense | $ 18,100.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Fire Department | $ 750.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Hospitality Staff | $ 2,900.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Medical Expense | $ 3,000.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Operations Labor Expense | $ 4,500.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Operations Supply Expense | $ 4,200.00 | *Amortized Expense/existing rental* |
| Portolet Rental | $ 4,000.00 | *Amortized Expense/existing rental* |
| Police Expense | $ 20,500.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Usher/Ticket Taker Expense | $ 10,750.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Parking Labor | $ 11,000.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Parking Non Labor (Equipment) | $ 6,425.00 | *Estimate based on 9,000 guests, 6pm Gate time* |
| Chair/Table Rental | $ 675.00 | *Amortized Expense/existing rental* |
| | **$ 100,450.00** | ***Total*** |

| Other Expenses | Estimated Expenses | Notes |
|---|---|---|
| Rental Fee | $ 25,000.00 | *Licensee to cover with purchased COI* |
| ASCAP, BMI, SESAC, GMR | $ 6,250.00 | *Estimate based on 9K attendance* |
| | **$31,250.00** | ***Total*** |

Venue to receive 100 manifested seats at no cost that are mutually agreed upon between LN and Licensee. Venue has unmanifested seats in Section 2, Row X, Seats 1-34 as well as Boxes that are explicitly for LN use.

*Please Note: These are estimated expenses only and should in no way convey final expenses.*
*Not Included: COGs associated with LN retained revenue (Ancillary Upsell COGs, Concessions COG, Merch COG )*

# LN RECORDING ADDENDUM

This LN Recording Addendum (this "Addendum") supplements the Venue License Agreement (the "Agreement") dated May 1st, 2024 by and between Fifth Degree Tours # 2LLC. ("Licensee") and Live Nation Worldwide, Inc. ("LN").

1. All capitalized terms used but not defined in this Addendum shall have the same meanings set forth in the Agreement.
2. License. LN hereby grants Licensee the right to enter into the Venue on the Event date to film, photograph, record, broadcast and/or transmit the Event (collectively, "Record" or "Recording"). Licensee may Record solely in locations approved by Venue staff. Licensee may not use additional lighting without the approval of Venue staff. Licensee may not digitally manipulate or otherwise alter the image of the Venue without the prior written consent of LN. Licensee must work with a Venue coordinator in preparing and undertaking the planning, logistics and execution of Recording and to abide by all reasonable recommendations and requirements of the coordinator.
3. Clearances and Equipment.
   A. Licensee will be responsible for obtaining and paying all required rights and clearances that may be necessary in connection with Recording the Event, including without limitation releases from the artists and musicians, and licenses from applicable publishers, record labels, public performance organizations and any other third party rights holders.
   B. Licensee will be responsible for all costs associated with Recording, including without limitation equipment, set-up/load-in, security, office space and equipment, catering and supplemental labor. LN may require payment in advance of Recording at its discretion and will provide Licensee with an estimate of such costs when possible.
4. Ownership. Subject to the following, Licensee and its assigns will own all rights in and to the footage and other material resulting from Recording the Event ("Material").
   A. Licensee may use the Material for non-commercial archival and editorial purposes. Licensee will have no right to use the Material in whole or in part for any commercial purpose without the written consent of LN and the performing artist(s), where applicable. A commercial purpose includes without limitation the license or sale of the Material in any media now known or hereafter created, and the use of the Material for advertising or promoting the Event or Licensee and its assigns.
   B. Upon payment of the Origination Fee and any union fees described below, Licensee may use the Material for a commercial purpose throughout the universe, in perpetuity, in any manner and in any media, whether now known or later created.
5. Union Fees. Licensee will be responsible for any and all fees due to Venue staff as may be required under Venue's collective bargaining agreements for Recording the Event. LN may require payment of such fees in advance of the Recording at its discretion and will provide Licensee with an estimate of the fees when possible. If Licensee and its assignees subsequently choose to exploit the Material for a commercial purpose as described above, Licensee must pay additional fees to LN to cover required fees due to Venue staff.
6. LN Properties. Licensee will not use any LN or Venue names, marks or other properties owned by LN or its affiliated companies or sponsors (collectively "Properties") in connection with the Material without the express written consent by LN. Notwithstanding the foregoing, Licensee may include Properties in the Material solely as they may appear on signs on display at the Venue at the time of Recording; provided that to the extent any signs display third party trademarks, Licensee will either (1) obtain the necessary consent from the third party to include its trademarks in the Material, or (2) blur the trademarks within the Material so that they are not distinguishable. LN and Venue will be credited in any broadcast or other publication of the Recording as follows: "Recorded at PNC Music Pavilion by permission of Live Nation Worldwide, Inc.".
7. No Disparaging Remarks. Licensee represents, warrants and covenants that the Material and the exploitation of the Material will not include any disparaging remarks, comments or actions about or toward the Venue or the Released Parties.
8. Insurance. If the Recording is being used for non-editorial commercial purposes, in addition to any other insurance requirements set forth herein, Licensee shall maintain appropriate Errors and Omissions coverage ("E & O Coverage") applicable to the Recording with limits of not less than One Million Dollars ($1,000,000.00). Such E & O Coverage shall have standard coverage, including, but not limited to, defamation, infringement of copyright, infringement of rights in material to be broadcast or in the manner of presentation thereof, invasion of privacy rights and unauthorized use of material.

ACCEPTED AND AGREED:

**LICENSEE: FIFTH DEGREE TOURS #2 LLC.:**

By: Wesley Hunter

Name: Wesley Hunter

Title: CEO

Date: 05/03/2024

**LIVE NATION WORLDWIDE, INC.**

By: [signature]

Name: Jonathan Rosas

Title: National Director 3rd Party Programming

Date: 05/05/24